DENNIS P. TURLINGTON v. ROSA D. McLEOD, GRACE MATTHEWS, FRED
    McLEOD, LOUISE McLEOD, JOHN SEYMOUR, KAREN SEYMOUR, RON-
    NIE LEE, JUNE ELLEN LEE, MAYLON AVERY, FLOSSIE AVERY, MIKE
    JOHNSON, KATHY JOHNSON, HARRY MATTHEWS, DEBBIE MAT-
    THEWS, MACKIE WHITE, BETTY BYRD WHITE, CRAIG MATTHEWS,
    AND DENISE CURRIN MATTHEWS

No. 206PA88

(Filed 8 December 1988)

**Highways and Cartways § 12.1— cartway proceeding—meaning of standing timber
    —cutting for firewood**

> The term "standing timber" as used in the cartway statute, N.C.G.S.
> § 136-69, encompasses all growing trees, including trees suitable only for
> firewood. Therefore, the statute provides for cartways for the purpose of cut-
> ting and removing firewood from property to which there is no other access
> from public roads.

ON discretionary review of the decision of the Court of Ap-
peals, 89 N.C. App. 515, 366 S.E. 2d 542 (1988), vacating a judg-
ment entered 17 October 1986 by *Stephens, J.,* in the Superior
Court, HARNETT County. Heard in the Supreme Court on 11 Oc-
tober 1988.

*Stewart and Hayes, by Gerald W. Hayes, Jr. and Vernon K.
Stewart, for the petitioner appellant.*

*Bryan, Jones, Johnson & Snow, by James M. Johnson, for the
respondent appellee.*

MITCHELL, Justice.

The question presented by this case is whether the cartway
statute, N.C.G.S. § 136-69*, employs the general meaning of "tim-

---

    * N.C.G.S. § 136-69 states in pertinent part:

    If any person, firm, association, or corporation shall be engaged in the
cultivation of any land or the cutting and removing of any standing timber . . .
to which there is leading no public road or other adequate means of transpor-
tation . . . such person, firm, association, or corporation may institute a special
proceeding . . . and if it shall be made to appear to the court necessary, rea-
sonable and just that such person shall have a private way to a public road or
watercourse or railroad over the lands of other persons, the court shall appoint
a jury of view of three disinterested freeholders to view the premises and lay
off a cartway, tramway, or railway of not less than 18 feet in width . . . and

ber" and thereby provides for cartways for purposes of cutting and removing firewood from property to which there is no other access from public roads. We conclude that it does. Therefore, we reverse the decision of the Court of Appeals.

The facts are not in dispute. The trial transcript and record on appeal show that the petitioner owns a tract of land of about 21 acres in Harnett County that is surrounded by the lands of the respondents and fronts on no public road. Rosa D. McLeod, the only respondent to perfect an appeal of the judgment of the trial court in this proceeding, owns a tract that lies between rural paved road 2009 and the petitioner's property. The bulk of the McLeod tract lies on the southern side of the petitioner's property. Although the exact distance is not clearly established by the transcript or record, it evidently is less than 100 feet from the petitioner's property to 2009 across Rosa McLeod's property. The lands of the other respondents lie to the north between the petitioner's property and rural paved road 2008, which is about 2,000 feet from the petitioner's property.

The petitioner purchased his property in 1978. At about that time, he obtained permission from Rosa McLeod's late husband, Harvey McLeod, to cross the McLeod property from 2009 to tend hogs on his property. The petitioner built a road over the McLeod property, which he continued to use even after his hog farming ceased in 1980. Harvey McLeod died in 1979. In 1984, Rosa McLeod terminated the petitioner's license to use her property, and complained of too much noise, traffic and litter generated by the petitioner and other users of his property. During some periods since then, the petitioner has had permission from some of the other respondents to use their property for access between his property and rural paved road 2008.

In 1984, the petitioner initiated a cartway proceeding pursuant to N.C.G.S. § 136-68 and § 136-69 involving this same property and Rosa McLeod. The trial court in that action determined that the petitioner was not then entitled to a cartway because he was not using his property for any of the purposes specified by N.C.G.S. § 136-69 and because at that time he had permission

___

assess the damages the owner or owners of the land crossed may sustain thereby, and make report of their findings in  writing to the clerk of the superior court.

from other landowners to use their property as means of access. That judgment was affirmed on appeal. *Turlington v. McLeod*, 79 N.C. App. 299, 339 S.E. 2d 44, *disc. rev. denied*, 316 N.C. 557, 344 S.E. 2d 18 (1986).

The petitioner initiated the present cartway proceeding in the Superior Court, Harnett County, with the filing of a new petition in June 1986. A jury found that the petitioner was entitled to cartway access to his property over the lands of one or more of the respondents. Judgment was entered on that verdict, directing the Clerk of Superior Court for Harnett County to appoint a "jury of view" for laying out the cartway according to the requirements of N.C.G.S. § 136-69.

Only the respondent Rosa McLeod perfected an appeal. She contended, contrary to the jury's verdict, that the petitioner was not using his property for any of the permitted purposes under the statute and that he had access to a public road from his property. The Court of Appeals rejected the respondent's argument that the evidence introduced at trial was insufficient to show that the petitioner's property was without access to a public road. There was sufficient competent evidence at trial to support that finding, the Court of Appeals concluded. The respondent does not raise that issue before this Court, and there is no need for us to address it further.

In addressing the respondent's remaining argument, the Court of Appeals relied on evidence, not disputed on appeal, that most of the marketable timber had been sold from the petitioner's property years before. Some oak and hickory trees suitable only for firewood remain, which the petitioner occasionally fells and saws into firewood as needed by customers. The Court of Appeals, addressing a novel question, concluded that the term "standing timber" as used in the cartway statute does not include trees that are suitable only for firewood. Therefore, it concluded, the evidence of the petitioner's land use presented at trial was insufficient to entitle him to a cartway under the statute, since cutting and removing firewood was the only significant use claimed. Accordingly, the Court of Appeals vacated the trial court's judgment in favor of the petitioner. From that decision, the petitioner sought discretionary review by this Court pursuant to N.C.G.S. § 7A-31, which was allowed by order of the Court dated 30 June

1988. The only question brought forward for our review is whether the Court of Appeals erred in its narrow interpretation of the term "standing timber" as used in N.C.G.S. § 136-69.

The Court of Appeals concluded that since the cartway statute infringes on the common law rights of adjacent property owners, it must be strictly construed. Accordingly, the Court of Appeals applied a narrow definition of the term "timber" drawn from several sources which have limited that term to large trees suitable for cutting into building materials. To strictly construe the cartway statute, the Court of Appeals reasoned, the limited definition of "timber" found in those sources should be applied under the statute. We disagree.

The question presented is one of statutory interpretation, and we are guided by well-settled principles. In the construction of statutes, our primary task is to determine legislative intent while giving the language of the statute its natural and ordinary meaning unless the context requires otherwise. *Housing Authority v. Farabee*, 284 N.C. 242, 200 S.E. 2d 12 (1973). It is equally clear that in our interpretation of statutes in derogation of the common law and of statutes which infringe upon the common law property rights of others, we must strictly construe their terms to encompass no more than is expressly provided. *Candler v. Sluder*, 259 N.C. 62, 130 S.E. 2d 1 (1963). It also is well settled, however, that the rule requiring strict construction does not mean that such statutes are to be stintingly construed to provide less than what their terms would ordinarily be interpreted as providing. Strict construction of statutes requires only that their application be limited to their express terms, as those terms are naturally and ordinarily defined. *Harrison v. Guilford County*, 218 N.C. 718, 12 S.E. 2d 269 (1940). *See also* 82 C.J.S. *Statutes* § 393 (1953). Our task then is to give effect to the legislative intent embodied in the cartway statute by giving its terms their natural and ordinary meanings.

In ordinary usage, the term "timber" includes "growing trees or their wood." Webster's Third New International Dictionary 2394 (1976). *See also* The American Heritage Dictionary of the English Language 1345 (1969). We apply that definition here according to the previously stated principles of statutory construction. Therefore, we conclude that the trees which remain standing

on the petitioner's property are "timber" as that term is ordinarily used and that the petitioner is entitled to a cartway to enable him to cut and remove that standing timber for firewood.

This Court has similarly applied the ordinary and broad definition of the term "cultivation" in determining the scope of another type of land use for which the owner of land is provided access to a public road under the cartway statute. In doing so, we recognized that the statute should be strictly construed and that "cultivation" in a narrow sense means breaking the soil as with a plow. Nevertheless, this Court held that in the ordinary sense in which the term "cultivation" was used in the cartway statute, it included gathering any kind of crop, including apples from trees. *Candler v. Sluder*, 259 N.C. at 65, 130 S.E. 2d at 4. We so held notwithstanding that the apples were simply harvested for family and friends and were not sold commercially.

The respondent and the Court of Appeals base their narrow definition of "timber" on cases and other sources of definitions which we do not find persuasive in the context of our cartway statute and the facts of this case. Among those sources relied upon is the restricted definition of "timber" found in Black's Law Dictionary 1653 (rev. 4th ed. 1968), which would limit the term to trees suitable for producing building materials. That definition was drawn from a distinguishable context, however, and we also note that the word "timber" has been omitted from the current edition of that compilation of words and terms having special legal significance. *See* Black's Law Dictionary (5th ed. 1979).

The Court of Appeals also relied upon *People v. Bolling*, 140 Mich. App. 606, 364 N.W. 2d 759 (1985), in which the Michigan Court of Appeals overturned the felony conviction of a man who had cut down a seven-foot tree from a windbreak on another person's property to use as a Christmas tree. The decision was based on a strict construction of Michigan's timber act, which made it a felony to steal from the property of another "any tree, trees, timber, wood . . ." having a value of more than twenty-five dollars.

The Michigan Court of Appeals—noting that the defendant could have been prosecuted under no less than three Michigan misdemeanor theft statutes—reasoned that the timber act must be narrowly construed for the benefit of the criminal defendant

and accordingly gave narrow effect not only to the term "timber" but to all the other terms in the statute. The terms "any tree," "trees" and "wood" were interpreted as meaning only "timber." The court then looked to cases which defined the term "timber" as it is used in the context of commercial timber contracts and to other cases borrowing the definition from that context. Those cases generally limited the term "timber" to trees suitable for building materials. The court adopted that limited definition for use in the criminal act before it and found that the Christmas tree theft was not covered by the statute.

The *Bolling* court was dealing with peculiar circumstances in a criminal context, and the case is distinguishable from this case on those and other counts as well. Additionally, the court's analysis in *Bolling* was inadequate. The *Bolling* court borrowed the narrow definition of "timber" from the commercial contractual context for application in a criminal statute as if the same meaning of the term was necessarily intended in those different contexts. In our view, the *Bolling* court did not adequately consider whether the public policies and legislative intent underlying the criminal statute might warrant applying a different definition of the term "timber" than that accepted by timber dealers in commercial timber contracts. We believe that statutory interpretation of the term "timber" in differing contexts requires distinguishing legislative intents and other considerations as they might differ in those contexts. 54 C.J.S. *Logs and Logging*, § 2 (1987) ("timber" can have enlarged or limited meaning according to the situation in which it is employed). That was the admonition of *U.S. v. Schuler*, 27 F. Cas. 978 (C.C.D. Mich. 1853) (No. 16,234), also cited in *Bolling*, in which the federal circuit court in Michigan applied a narrow definition of the term "timber" in a federal statute, after ascertaining a congressional intent to use the term as it was used in a commercial context, as the statute was directed against illicit commerce between timber cutters and traders.

The other cases and sources relied upon by our Court of Appeals in this case, like most of those relied upon in *Bolling*, construe the term "timber" in the context of "timber" contracts, "timber" deeds and the "timber" industry, and give the term "timber" the narrow definition applied to it in that industry. It is in that commercial contractual context that the great bulk of cases construing the term have been decided. *See, e.g., Byrd v.*

Turlington v. McLeod

*Sexton*, 161 N.C. 569, 77 S.E. 697 (1913) (conveyance of "timber" passes title to all trees capable of being sawed into merchantable lumber); *Wiley v. Broaddus & Ives Lumber Co.*, 156 N.C. 210, 72 S.E. 305 (1911) ("all timber" language in contract did not include worthless timber but only such pine and gum as could be sawed into boards for ordinary purposes).

When interpreting private contracts for the sale of timber, a court must give effect to any trade usage and special definitions of terms understood by both parties, as it is such understanding of the parties that defines the contract, its scope and its enforceability. In the commercial contractual context, "timber" ordinarily may very well have a restricted meaning that excludes firewood, as contractual exploiters of timberland generally have not been in the business of selling firewood. It is another matter, however, to determine the definitions of terms as used in general legislative enactments such as the cartway statute. Such determinations call for broader considerations of public policy and general legislative intent concerning all citizens. As previously noted, interpreting such statutory terms requires according them the definitions ordinarily given them by the general public. *Housing Authority v. Farabee*, 284 N.C. 242, 200 S.E. 2d 12 (1973).

Furthermore, when a statute on its face reveals the legislative intent and purpose, its terms are to be given meaning consistent with that intent and purpose. *Underwood v. Howland*, 274 N.C. 473, 164 S.E. 2d 2 (1968). Our conclusion that the term "standing timber" as used in the cartway statute includes all growing trees is consistent with the legislative intent and purpose which we draw from the face of the cartway statute. The statute, originally enacted in 1798 and amended several times over its long history to provide access for additional types of uses of otherwise inaccessible property, reflects a general legislative policy favoring the practical use of property and its natural resources which otherwise could not be put to such use for lack of road access. The respondent, in her brief, argues that the legislature had a more grandiose intent to open up "large tracts of timber" for construction purposes. The language of N.C.G.S. § 136-69 shows otherwise. It provides that, "If *any person*, firm, association, or corporation shall be engaged in the cultivation of *any* land or the cutting and removing of *any* standing timber, . . ." they may qualify for a cartway. (Emphasis added.) Those

---

**In re Lynette H.**

---

provisions clearly encompass the small landowner, the small harvester of crops and the small timber cutter.

We conclude that the legislature did not intend that only owners of land with timber suitable for construction should be able to realize the practical use and value of their property. Nor do we believe that the legislature intended the cartway statute to favor the cultivator of a small plot of land or the harvester of apples or nuts over the harvester of firewood, a commodity of some economic significance. Allowing this petitioner to make practical use of his property by granting him access to it from a public road for cutting and removing firewood is consistent with the intent of the cartway statute. As we have indicated, that intent is revealed by the statutory language itself and by the various land uses for which the statute provides access.

For the foregoing reasons, we conclude that the petitioner's evidence at trial that he was engaged in cutting and removing firewood from his property was sufficient evidence of use to entitle him to cartway access as provided by N.C.G.S. § 136-68 and § 136-69. Therefore, we reverse the Court of Appeals and remand for reinstatement of the judgment of the trial court.

Reversed.