*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DANIEL STOMBER,

       Plaintiff-Appellant,

v

SANILAC COUNTY DRAIN COMMISSIONER,

       Defendant-Appellee,

and

COUNTY OF SANILAC,

       Defendant.

UNPUBLISHED
December 22, 2020

No. 347360
Sanilac Circuit Court
LC No. 18-037518-CZ

ON REMAND

Before: RONAYNE KRAUSE, P.J., and CAVANAGH and SHAPIRO, JJ.

PER CURIAM.

Plaintiff, Daniel Stomber, appeals by right the trial court's grant of summary disposition in favor of defendant, the Sanilac County Drain Commissioner. This case arises out of the destruction of most of a double row of trees planted along the southern portion of plaintiff's property pursuant to maintenance work defendant performed on a drainage ditch that ran along that edge of plaintiff's property. Many of plaintiff's original claims were, for one reason or another, not pursued on appeal. We previously held that (1) the drain commissioner was only empowered to remove trees within an easement granted to Sanilac County for purposes of maintaining the drain; (2) both rows of trees were within that easement; (3) the drain commissioner did not commit an uncompensated taking despite plaintiff's claimed damage to his property; (4) the drain commissioner did not engage in abusive or selective enforcement of his powers; and (5) plaintiff had not actually entered into a contract with the drain commissioner, so the drain commissioner could not have breached

-1-

any such contract. On appeal, our Supreme Court vacated our opinion and remanded.[1] We again affirm.

## I. BACKGROUND

Our Supreme Court's order states that the matter is remanded for reconsideration of a single issue: our conclusion that both rows of plaintiff's trees—as opposed to one row that was undisputed—was within the drain maintenance easement. Our Supreme Court has directed us to answer five specific questions in providing our "reconsideration." Our Supreme Court described those questions as

> On remand, the Court of Appeals shall reconsider whether the easement actually extends beyond the fifty-foot strips explicitly described in the releases by addressing: (1) the basis for the conclusion that "[t]he drafters of the releases would have understood the formal property descriptions to be the 'surveys' referenced in the above language[;]" (2) whether the "formal property descriptions" of the fifty-foot strips referred only to "the extreme width of said drain as shown in the survey thereof," and, if so, the basis for this determination; (3) whether "the 'and also' clause was merely a reference back to the same fifty-foot strips," and, if so, the basis for this determination; (4) whether the inclusion of the phrase "for construction of drain and deposition of earth" within the "formal property descriptions" contemplates land other than the drain itself located within the fifty-foot strips that was reserved for maintenance; and (5) whether "and also" merely conjoined "the extreme width of said drain as shown in the survey thereof" with "sufficient ground on either side of the center line of said drain" in describing in plain language what the conveyance included.

We expressly reaffirm and readopt the entirety of our prior opinion, and we provide the following clarifying analysis.

## II. LANGUAGE OF THE RELEASES

As an initial matter, we did not set forth the entirety of each of the 1929 releases in our prior opinion. We recognize that this omission was confusing. To aid in comprehending why we drew the conclusions we drew in our prior opinion, we therefore provide the entirety of the releases, omitting such things as signatures and other boilerplate materials. Unfortunately, parts of the releases are, for no readily explicable reason, illegible.

The first release provided as follows:

> For and in Consideration of prospective benefits to be derived by me us [sic] by reason of the deepening, widening, straightening and extending of a certain Drain under the supervision of the County Drain Commissioner of the County of Sanilac and State of Michigan, as hereinafter described, We H. McGregory & wife

---

[1] *Stomber v Sanilac Co Drain Comm'r*, ___ Mich ___; 948 NW2d 593 (2020).

Millie Evergreen of Sanilac, the Right of Way for a certain drain, hereinafter more particularly designated and described, over and across the following lands owned by me us [sic] and situated in the County of Sanilac and the State aforesaid, and more particularly described as follows, to-wit: S 1/8 of SW 1/4 of Sec 28. T. 13 N.R. 12 E. The right of way conveyed and released is for the sole and only purpose of deepening, widening, straightening and extending over and across the said premises a certain Drain, application for which in writing was made on the 8th day of October AD 1928 by Jacob Richter and others and the locality for which has been determined by the Board of Determination or [illegible] of Stony Creek Drain of the County of Sanilac, State of Michigan, which Board determined that said Drain was a necessity and necessary and conducive to public health, convenience and welfare, and the practicability thereof has been determined by Board of Determination in their order bearing date this 27th day of December AD 1928, in which order the route and course of said drain is described as follows, to-wit:

No 1. H McGregory (same as No. 4 Main)

Taking a strip of land 50 feet wide on each side of a line commencing at a point 12.33 chs. W. of the SE [*illegible*] at a point 0.50 chs. N of SE. corner thereof, traversing the last mentioned description a distance of 12.33 chains.

This conveyance is based upon the above described line of Route and shall be deemed to include the extreme width of said drain as shown in the survey thereof, to which reference is hereby made for a more particular measurement, and includes a release for all claims to damages in any way arising from or incident to the opening and maintaining of said drain across said premises, and also sufficient ground on either side of the center line of said drain for the construction thereof and for the deposit of the excavations therefrom.

Attached was a second page seemingly repeating the "Taking a strip of land…" descriptive language, but the entirety is legible. It provided the following description:

Taking a strip of land 50 feet wide on each side of a line commencing at a point 12.33 chs. W. of the SE Cor. and 0.50 chs. N therefrom of the S 1/2 of SW 1/4 of Sec. 28, T 15 N. R. 12 E. for construction of drain and deposition of earth, and running thence N 89 deg. E 12.33 chs. up to East boundary line at a point 0.50 chs. N of SE. corner thereof, traversing the last mentioned description a distance of 12.33 chains.

The second release was identical in all respects other than the description of the drain. It described the drain as:

No. 4 H. McGregory

Taking a strip of land 50 feet wide on each side of a line commencing at a point 0.50 chs. N. of the SW [*illegible*] line of hubs up to South boundary line at a point 27.77 chs. E. of the SW. corner thereof, traversing the last mentioned distance of 27.85 chains.

As with the first release, attached was another page repeating the "Taking a strip of land…" descriptive language, and again was fully legible. It provided the following description:

> Taking a strip of land 50 feet wide on each side of a line commencing at a point 0.50 chs. N. of the SW Cor of S 1/2 of SW 1/4 of Sec. 28. T. 15 N. R 12 E. for construction of drain and deposition of earth and continuing thence along the N. side of existing highway N. 89 deg. E. 27.67 chs; thence S. 1 deg. W 0.18 chs. as measured by line of hubs up to South boundary line at a point 27.77 chs. E. of the SW. corner thereof, traversing the last mentioned distance of 27.85 chains.

Based on the identical beginnings and ends of the drain descriptions within and attached to the releases, we infer that those descriptions were intended to be identical. In any event, critically to this matter, both unambiguously provide for "a strip of land 50 feet wide on each side of a line."

A release is treated as a contract for purposes of interpreting its meaning and implications. *Shay v Aldrich*, 487 Mich 648, 667; 790 NW2d 629 (2010). Thus, our obligation is "to determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning," and if unambiguous, we must apply the language as written. *In re Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008). Importantly, the goal is to discern the intent of the parties at the time the contract was made. *Biltmore Land Co v Munro's Estate*, 271 Mich 125, 129; 260 NW 135 (1935). In the context of interpretation of statutes, it is important to know what words meant at the time of enactment, and thus it is proper to consult a dictionary from the era in which the statute was drafted. *In re Certified Question from United States Court of Appeals for Ninth Circuit (Deacon v Pandora Media, Inc)*, 499 Mich 477, 484-485; 885 NW2d 628 (2016); *People v Boling*, 140 Mich App 606, 611-612; 364 NW2d 759 (1985). We think the same principle applies to interpretation of older contracts.

We therefore begin with the language of the releases. At the time the releases were drafted, the word "and" would have been commonly understood to mean:

> **1**. A particle expressing the general relation of connection or addition, and used to conjoin word with word, clause with clause, or sentence with sentence, sometimes with an implication of: **a** Repetition; as, they rode two *and* two, hundreds *and* hundreds. **b** Variation or difference; as, "there are women *and* women," that is, women of different sorts. **c** The modification of one of the connected ideas by the other; as, "the tediousness *and* process of my travel," that is, "the tedious process," etc.; "thy fair *and* outward character," that is, "outwardly fair character." **d** A consequence or sequel; as, I said go *and* he went. *And* is very frequently used where accurate and proper expression requires the word *or*; but, in the legal construction of language, either word will be treated as if it were the other whenever this construction is plainly required to give effect to the intention of the person using it; thus, in a bequest to "a person *and* her bodily issue" *and* may be read as *or*; in a law providing that certain cities may tax property "taxable for State *and* county purposes," *and* may be construed as *or*. Such use of the word *and*, although common, is improper; and the words *and* and *or* are not properly in any sense interchangeable.

**2**.  In order to; -- used instead of the infinitival *to* after *try*, *come*, *go*, *send*, and colloquially or dialectically after various other verbs. . . .

**3**.  Sometimes merely expletive or intensive. . . .

**4**.  If; though.  [*Webster's New International Dictionary of the English Language*, 1930 ed, p 82 (emphases in original).]

Or, similarly:

A conjunction connecting words or phrases expressing the idea that the latter is to be added to or taken along with the first.  It is said to be equivalent to "as well as." . . .  It is sometimes construed as meaning "or," and has been so treated in the construction of statutes.  [*Bouvier's Law Dictionary*, 3d ed, Vol 1, pp 194-195.]

Our Supreme Court has explained that the words "and" and "or" may be treated as interchangeable where needed to make a statute conform to the obvious intent of the Legislature or a contract conform to the obvious intent of the parties.  *Heckathorn v Heckathorn*, 284 Mich 677, 680-682; 280 NW 79 (1938); *Gates v Kenney*, 223 Mich 187, 188-190; 193 NW 808 (1923).  Nevertheless, consistent with the above dictionary definitions, the proper meaning of the word "and" is primarily as a conjunction "used to denote a joinder, a union."  *Mich Public Service Co v City of Cheboygan*, 324 Mich 309, 341; 37 NW2d 116 (1949); see also, *OfficeMax, Inc v US*, 428 F 3d 583, 588-590 (CA 6, 2005).

The word "also" would have been understood at the time as meaning:

**1**.  Even as; just so; even thus; as; so . . .

**2**.  In the same manner (as something else); likewise; hence; in addition; as well; besides; too. . . .

**Syn**. – Also, too, likewise are used in adding one proposition or consideration to another.  Also adds to a statement something which may be affirmed equally with what precedes . . . .  [*Webster's New International Dictionary of the English Language*, 1930 ed, pp 63-64 (emphases in original).]

Likewise:

The word ["also"] imports no more than "item" and may not mean the same as "moreover"; but not the same as "in like manner."  . . .  It may be (1) the beginning of an entirely different sentence, or (2) a copulative carrying on the sense of the immediately preceding words into those immediately succeeding.  [*Bouvier's Law Dictionary*, 3d ed (1914), Vol I, p 183.]

This Court has similarly treated the word "also" as connoting an addition or supplementation.  See *Alford v Pollution Control Indus of America*, 222 Mich App 693, 698; 565 NW2d 9 (1997).

Taken together and given their most common and typical meanings as persons would have understood them in 1929, we conclude that "and" and "also" do not mean exactly the same thing, but both broadly bridge one thing to another thing in an additive manner. They are also used to set off two things from each other, such that it is possible to distinguish from the structure of a sentence the identify of those two things. We therefore infer that the only sensible understanding of the release language is that the clause "sufficient ground on either side of the center line of said drain for the construction thereof and for the deposit of the excavations therefrom" was demarked as a separate grant in addition to a preceding grant.

Next, we must therefore identify that preceding grant. Guiding us in this adventure is the principle that commas typically are used to demark items in a list, or to set clauses or modifiers off from each other; but at the same time form should not be exalted over substance. *People v Small*, 467 Mich 259, 263 n 4; 650 NW2d 328 (2002); *In re Forfeiture of $5,264*, 439 Mich 242, 253; 439 NW2d 246 (1989); *People v Walker*, 330 Mich App 378, 390; 948 NW2d 122 (2019). See also, *Webster's Collegiate Dictionary*, 3d ed (1919), pp 1213-1214.

We note that in each of the releases, there is provided a description of the drain itself, followed by, again:

> This conveyance is based upon the above described line of Route and shall be deemed to include the extreme width of said drain as shown in the survey thereof, to which reference is hereby made for a more particular measurement, and includes a release for all claims to damages in any way arising from or incident to the opening and maintaining of said drain across said premises . . . .

Interestingly, dictionaries at the time seem to have treated the word "include" as close to synonymous to what we would understand today as *enclose*: referring to confining, shutting up, inclosing; but also to embracing or containing. *Webster's New International Dictionary of the English Language*, 1930 ed, pp 1088-1089; *Bouvier's Law Dictionary*, 3d ed (1914), Vol II, p 1527. Either way, the above language provides for a conveyance of "the extreme width of" a described drain based on a described line of route, with specific reference to a "survey." When used as a noun, "survey" would have been understood as:

> **1**. Act of surveying; a general view, as from above. . . .
>
> **2**. A particular view; an examination, esp. an official examination, of all the parts or particulars of a thing to ascertain its condition, quantity, or quality; as, a *survey* of the stores of a ship; a *survey* of roads and bridges.
>
> **3**. The operation of finding and delineating the contour, dimensions, position, etc. as of any part of the earth's surface, whether land or water; as, a land or hydrographic *survey*; also, a measured plan and description of any portion of country, or of a road or line through it. [*Webster's New International Dictionary of the English Language*, 1930 ed, p 2087 (emphases in original).]

Or:

The act by which the quantity of a piece of land is ascertained; the paper containing a statement of the courses, distances, and quantity of land is also called a survey. . . . [*Bouvier's Law Dictionary*, 3d ed (1914), Vol III, p 3211.]

Thus, the word "survey" would clearly have encompassed the descriptions of the drain found in the "Taking a strip of land…" language. We further note that a second copy of that language was attached to each release. By process of elimination, there simply is nothing else to which the conveyance could refer.

It necessarily follows that the first conveyance consists of the drain descriptions that, in each of the releases, commences with "Taking a strip of land…" Thus, we must next examine those descriptions to determine their meaning. Fortunately, this is less difficult. The beginning of each of those descriptions more fully states, "Taking a strip of land 50 feet wide on each side of a line…" It does not appear that there is any doubt that the line itself traverses across plaintiff's property; in any event, we consulted Sanilac County's online GIS mapping service and confirmed to our own satisfaction that it does. The word "each" would have been understood as meaning:

Every (individual of two or more, esp. of a definite number) considered separately from the rest. As now used *each* generally implies reference to a definite number or group of objects and emphasizes the consideration of them as individuals; every emphasizes the fact that *all* the individuals of a class or group are included, whether definite or indefinite in number; as, "*each* side of a cube is equal to *every* other side." *Each* is often used pronominally, referring to a noun before or after it. [*Webster's New International Dictionary of the English Language*, 1930 ed, p 690 (emphases in original).]

The word "side" had numerous possible definitions, from which we will take the liberty of recounting only those of apparent possible relevance:

**1**. The margin, edge, verge, or border of a surface; esp. one of the longer edges of a thing as distinguished from shorter edges (called *ends*); a bounding line of a geometrical figure; as, the *side* of a field, square, river, road, etc.

**2**. One of the surfaces that define or limit a solid, esp. one of the longer surfaces; a part (as a wall of a room) connecting the extremities of the top and bottom; a face; as, the *side* of a box, a plank, a lens, a prism, etc.

**3**. Any outer portion of a thing considered apart from, and yet in relation to, the rest; as, the upper *side* of a sphere; also, any part or position viewed as opposite to or contrasted with another; as, this or that *side*. . . .

**8**. Fig.: An aspect or part regarded as contrasted with some other; as, the bright *side* of poverty. [*Webster's New International Dictionary of the English Language*, 1930 ed, p 1952 (emphases in original).]

Taken together, the phrase "a strip of land 50 feet wide on each side of a line" therefore indicates two such strips that extend 50 feet from a line down the center where those strips meet. Consequently, such a conveyance would actually be 100 feet wide in total.

Which brings us back to the second portion of the conveyance, beginning with "and also." We reiterate our previous holding that, unlike the contours of the drain, this second conveyance offers no real specificity for how much land is involved and must be construed as a "reasonable" amount. We do not read our Supreme Court's order as criticizing our determination that the trial court did not clearly err in finding plaintiff's trees to be within this additional "reasonable maintenance area." Rather, we infer that our Supreme Court only took exception to our failure to fully explain why the easement included *anything* beyond the defined boundaries of the drain. For the reasons discussed, we conclude that the releases granted a conveyance consisting of two parts: (1) a 100 foot wide strip centered over the center-line of the drain itself, with the addition of (2) *something* beyond those 100 feet, the width of which is not specifically defined but rather guided by the need for such additional land for construction purposes.

### III. ANSWERING OUR SUPREME COURT'S QUESTIONS

Nevertheless, we have been specifically directed to answer several questions, some of which we find difficult to consider independently.

### A. THE BASIS FOR THE CONCLUSION THAT "[T]HE DRAFTERS OF THE RELEASES WOULD HAVE UNDERSTOOD THE FORMAL PROPERTY DESCRIPTIONS TO BE THE 'SURVEYS' REFERENCED IN THE ABOVE LANGUAGE"

As we more fully discussed above, the definition of "survey" at the time would have been understood as referring to a description of property. Furthermore, a second copy of the description of the drain was attached to each release. Neither party has argued that the documents we relied on was not the relevant "survey" or that some other "survey" existed, nor is such an indication present on the record.

### B. WHETHER THE "FORMAL PROPERTY DESCRIPTIONS" OF THE FIFTY-FOOT STRIPS REFERRED ONLY TO "THE EXTREME WIDTH OF SAID DRAIN AS SHOWN IN THE SURVEY THEREOF," AND, IF SO, THE BASIS FOR THIS DETERMINATION

We do not understand the "formal property descriptions" of the drains to say anything about the "extreme width of said drains." Rather, the first part of the conveyance references the "extreme width of said drains" as described in the descriptions of the drains. That being said, as we discussed more fully above, "include" would seemingly have been understood as a constraint at the time. Thus, the first part of the conveyance would indeed have been limited only to the two 50-foot strips totaling 100 feet wide.

### C. WHETHER "THE 'AND ALSO' CLAUSE WAS MERELY A REFERENCE BACK TO THE SAME FIFTY-FOOT STRIPS," AND, IF SO, THE BASIS FOR THIS DETERMINATION

As more fully discussed above, the words "and" and "also," particularly in conjunction, would have connoted something additional or supplemental. Furthermore, as we discussed in our prior opinion, if the " 'and also' clause" was merely a reference to the same 50-foot strips, that entire clause would have been pointless. See *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003). Notably, the two parts of the release conveyance differ in conceptual scope. The first part, referencing the drain description, is specific and absolute. The

second part, in the " 'and also' clause," is not specifically defined, being instead limited to land "sufficient" for construction and deposition.

## D. WHETHER THE INCLUSION OF THE PHRASE "FOR CONSTRUCTION OF DRAIN AND DEPOSITION OF EARTH" WITHIN THE "FORMAL PROPERTY DESCRIPTIONS" CONTEMPLATES LAND OTHER THAN THE DRAIN ITSELF LOCATED WITHIN THE FIFTY-FOOT STRIPS THAT WAS RESERVED FOR MAINTENANCE

As more fully discussed above, we construe "and also" as demarking one part of the conveyance from another. Thus, the language quoted by our Supreme Court must be considered in context: "sufficient ground on either side of the center line of said drain for the construction thereof and for the deposit of excavations therefrom." As also more fully discussed above, "as also" connotes something additional, or more than the drain itself. Thus, again, the "for the construction thereof and for the deposit of excavations therefrom" language refers to land (of an undefined amount) other than the land reserved for the drain itself. We note that the release states a "purpose of deepening, widening, straightening and extending over and across the said premises a certain Drain." This would seem to include "construction," meaning "construction" could be performed within the drain *and* on the additional land.[2] We do not believe deposition of excavations to be at issue in this matter.

## E. WHETHER "AND ALSO" MERELY CONJOINED "THE EXTREME WIDTH OF SAID DRAIN AS SHOWN IN THE SURVEY THEREOF" WITH "SUFFICIENT GROUND ON EITHER SIDE OF THE CENTER LINE OF SAID DRAIN" IN DESCRIBING IN PLAIN LANGUAGE WHAT THE CONVEYANCE INCLUDED

As more fully discussed above, we construe "and also" as providing for a conveyance of land *in addition to* the 100 feet of land specifically described in the drain. To construe the "and also" clause as a restatement of the preceding conveyance would not make grammatical sense in context. Although the word "and," standing alone, *could* be construed as a disjunction rather than a conjunction where it is apparent that the drafters intended to do so, (1) no such intent is apparent to us, and (2) inclusion of the word "also" more probably indicates an additive conjunction. Furthermore, construing "and also" as *conjoining* the extreme width of the drain with sufficient ground on either side of the center line of the drain would independently seem to *add to* the extreme width of the drain rather than *replace* it or constitute an incompetent attempt at alternative phrasing.

## IV. CONCLUSION

To the extent not contradicted by our supplemental analysis in this opinion, we expressly readopt and reaffirm our previous opinion in full. For the reasons discussed then and now, we

---

[2] The phrase speaks only to "construction," but MCL 280.6 provides that drain easements include access for "maintenance".

again affirm.  Likewise, we again direct that the parties shall bear their own costs.  MCR 7.219(A).

/s/ Amy Ronayne Krause
/s/ Mark J. Cavanagh
/s/ Douglas B. Shapiro